# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

DORIS DEPUTY,

        **Plaintiff,**

    v.                               **Case No. 02-C-0718**

LEHMAN BROTHERS, INC.,
S.G. COWEN SECURITIES CORPORATION,
COWEN & COMPANY,
HAMBRECHT & QUIST, INC., and
J.P. MORGAN CHASE & CO.,

        **Defendants.**

---

# DECISION AND ORDER

---

      Doris Deputy ("Deputy") is suing Lehman Brothers ("Lehman") and its co-defendants for various state law claims, including misrepresentation, negligent supervision, violation of fiduciary duty, and conversion. Deputy's action originated in Wisconsin state court, but was removed to federal court on the basis of diversity jurisdiction. In 2003, Lehman appealed, *inter alia*, a district court's determination that an arbitration clause in agreements entered into by the parties was not enforceable. *See Deputy v. Lehman Bros., Inc.*, No. 02-CV-00718 (E.D.Wis. Jan. 7, 2003) (Clevert, J.). The Seventh Circuit found that Deputy's claims clearly fell within the scope of the agreements' arbitration clauses and remanded the case for further

proceedings.[1]   Since that remand, a jury determined that Deputy's signature on one agreement was forged, but her signature on a custodial account opened for her grandson was found to be authentic.   Lehman seeks to enforce the arbitration clause in this custodial account agreement and compel arbitration for claims arising from accounts that Deputy holds in an individual, non-custodial capacity.   Lehman has moved for a new trial pursuant to Fed. R. Civ. P. 59, and Deputy has renewed her motion for judgment as a matter of law according to Fed. R. Civ. P. 50(b).

I.      BACKGROUND

Deputy's complaint chronicles an unfortunate series of events.   In the 1980's, Deputy and her husband (now deceased) began investing with a broker dealer named Frank Gruttadauria ("Gruttadauria"), who was employed, at various stages, by the Defendants to this action.   Over several years, Deputy sent hundreds of thousands of dollars to Gruttadauria and he seemed to invest that money with extraordinary foresight and acumen, as evidenced by the burgeoning value of Deputy's accounts.   But Deputy was deceived.   Gruttadauria defrauded Deputy and numerous other investors out of millions of dollars.   Gruttadauria had sent his clients falsified account statements that overstated the worth of their accounts. Deputy's accounts were, in fact, worth only a fraction of the value that had been represented

---

[1]Lehman emphasizes that Deputy's present motion is defeated by the law of the case doctrine.  The Seventh Circuit stated that "assuming . . . Deputy signed the agreement, her claims are subject to arbitration."  *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 513 (7th Cir. 2003).  The Seventh Circuit, however, did not address whether Deputy could be bound solely by her signature on the Client Agreement signed by her in a custodial capacity for her grandson's account.  This Court has carefully reviewed the Seventh Circuit's decision and is confident that this particular question was neither addressed nor contemplated by the Seventh Circuit.

Case 2:02-cv-00718-RTR   Filed 06/16/05   Page 2 of 28   Document 166

to her. As a result of his misdeeds, Gruttadauria is now serving a prison sentence. Deputy's amended complaint contends that Gruttadauria's employers are, in part, responsible for Gruttadauria's activities and the resulting damages to her.

The parties disputed whether Deputy's claims must be submitted to arbitration consistent with an arbitration provision found in two of Deputy's Lehman Client Agreements, dated April 21, 2001 and July 26, 2001 respectively. The former is a custodial account that Deputy opened for her grandson, Casey. The latter–the July 26th account–is an account that Deputy opened for herself in an individual capacity. There was a twist, however. Deputy contested the authenticity of the signatures appearing on those documents. She claimed that Gruttadauria forged her signatures on the account agreements as part of his illegal enterprise. Lehman maintained that the signatures were Deputy's own and, therefore, she was bound to arbitrate her grievances against them.

Following a trial on the authenticity of the signatures appearing on the agreements, a jury found that the signature on the July 26, 2001 agreement, a personal account of Deputy's, was not her own. However, the jury also found that Deputy's authentic signature did appear on the April 26th Agreement, the account opened by her and for her grandson. That Client Agreement clearly designates Deputy's signatory capacity pursuant to the Wisconsin Uniform Transfers to Minors Act ("the Wisconsin UTMA") and identifies her as the custodian for her grandson.

On June 14, 2004, the Court received Lehman's Motion for a New Trial and, on the next day, Deputy's Rule 50(b) Motion for Judgment as a Matter of Law After Trial.[2] Deputy asks this Court to find, as a matter of law, that her signature on her grandson's Client Agreement, and the arbitration provision contained therein, does not bind her to arbitrate her complaints against Lehman as Gruttadauria's employer. Lehman, in its motion, states that, if the Court should rule in Deputy's favor on her Rule 50(b) motion, it is entitled to a new jury trial because the Court erred in allowing Deputy to present an expert witness whose testimony misled and confused the jury, thereby impermissibly tainting the jury's verdict.

II.    ANALYSIS

Federal Rule of Civil Procedure Rule 50(b) states that a party may renew a motion for judgment as a matter of law if made within 10 days of the entry of judgment. Fed. R. Civ. P. 50(b). A party must move for judgment as a matter of law at the close of evidence or, by failing to do so, waive its right to file a renewed motion following the return of a verdict, regardless of the absence of prejudice to the non-movant. *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 775-76 (7th Cir. 2002). Insofar as this is a case in diversity, the Court applies the standard of the State of Wisconsin for renewed judgments as a matter of law. *See Winger v. Winger*, 82 F.3d 140, 143 (7th Cir. 1996); *Sokol Crystal Prods., Inc. v. DSC Communications., Corp.*, 15 F.3d 1427, 1434 (7th Cir. 1994) ("The rule

---

[2]In conformity with Fed. R. Civ. P. 50(b), Deputy moved the Court, after the close of evidence at trial, for a directed verdict regarding the question of whether the arbitration provision in her grandson's Agreement could force her to arbitrate those complaints related to her personal, individual accounts with Lehman. The same grounds appear in both motions.

4

in the Seventh Circuit is that in diversity cases, a district court should look to state law to determine the standard to be applied to a motion for judgment as a matter of law."). Wisconsin law, specifically section 805.14(5)(d) of the Wisconsin Statutes, states that "[a] party who has made a motion for directed verdict or dismissal on which the court has not ruled pending return of the verdict may renew the motion after the verdict." Wis. Stat. § 805.14(5)(d).

The crux of the argument between the parties is whether Deputy's signature on her grandson's account (i.e., the April 26, 2001, Agreement) binds her to arbitrate her grievances against Lehman.[3] To support their respective positions, the parties rely on different legal theories. Lehman invokes contract law and asserts that Deputy cannot evade the plain wording of the Agreement she signed, regardless of her signatory capacity as custodian. Deputy, by contrast, claims that her status as custodian on the account acts as a unique legal identity that prevents Lehman from imposing the terms of the Agreement onto her own personal, individual accounts. She also argues that Lehman has never produced those pages, which purportedly contain the Agreement's arbitration clause and, therefore, she cannot be bound by the arbitration clause supposedly contained in those missing pages.

The Court first considers Deputy's argument that she is not bound to arbitrate because Lehman has failed to produce those pages of the Agreement containing the relevant arbitration clause. Testimony elicited at trial showed that Lehman did not have, and likely

---

[3]The Client Agreement for the account of Deputy's grandson will hereinafter be referred to as "the Agreement."

never possessed, the third or fourth pages of the Agreement. The contested arbitration clause is found in Paragraph 22 of the photocopied third page of the Agreement, or, more precisely, the photocopied pages of a standard Lehman agreement which were offered in lieu of the Agreement's original pages (assuming they existed). The question before the Court is whether Lehman's inability to produce the third and fourth pages of the Agreement precludes any attempts to enforce the arbitration provision contained therein.[4]

There is a fundamental problem with Deputy's position: the Agreement states that the affixed signature (Deputy's) confirms that the signor received a copy of the arbitration provision. ("**I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22; I (we) have read it and agree to its terms.**")[5] Deputy's own signature acknowledges that the parties agreed to an arbitration provision as part of their agreement. Deputy *could* contest what, exactly, that

---

[4]The July 26th Agreement, which contains the same arbitration and choice-of-law clauses as the April 26th Agreement, contains a choice-of-law provision identifying New York law as controlling. ("This agreement, including the arbitration provisions in paragraph 22, shall be governed by the laws of the State of New York, without giving effect to the choice of law or conflict of laws provisions thereof.") (Def.'s Trial Ex. No. 1002.) This provision conflicts with Deputy's explicit invocation of the Wisconsin UTMA, which states:

> A transfer that purports to be made and which is valid under the uniform transfers to minors act, the uniform gifts to minors act or a substantially similar act of another state is governed by the law of the designated state and may be executed and is enforceable in this state if at the time of the transfer the transferor, the minor or the custodian is a resident of the designated state or the custodial property is located in the designated state.

Wis. Stat. § 880.615(3).

The Seventh Circuit Court of Appeals has already identified Wisconsin law as controlling the interpretation of the Agreement. *See Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 512 (7th Cir. 2003) (identifying Wisconsin law as governing the dispute between Lehman and Deputy). The Seventh Circuit made this determination when examining the very same Agreements before this Court. This Court is bound by the doctrine of the law of the case and, therefore, applies Wisconsin law to interpret the Agreement. *See United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001) (explaining that the law of the case doctrine applies to issues that the appellate court resolved).

[5]Deputy's grandson's Client Agreement (two pages) may be found as Defendant's Trial Exhibit No. 1000 and also as Exhibit B to Deputy's brief in support of her Rule 50(b) motion.

6

provision stated, but she has not advanced this argument. In any event, Deputy cannot contest that she received the whole Agreement–her signature indicates that she did. Thus the arbitration provision was in contemplation of the parties, they intended to contract for it, and there was a meeting of the minds on that term. *See Goossen v. Standaert*, 525 N.W.2d 314, 318 (Wis. Ct. App. 1994). The Court now turns to consider the substance of the Agreement with Lehman and the parties' arguments related thereto.

Deputy devotes the first section of her supporting brief to the position that a legal custodian is not individually and personally bound to the terms of a contract signed in a custodial capacity. (*See* Pl. D. Deputy's Br. in Supp. of her Rule 50(b) Mot. for J. as a Matter of Law after Trial ("Supp. Br.") at 8-11.) This proposition, grounded in agency law, seems virtually axiomatic and immune from attack.[6] Deputy is on firm ground in her assertions that her grandson is the owner of the funds in the account. (Supp. Br. at 8.) Her citations to Wisconsin's UTMA also correctly state that a custodian is not personally liable for contracts entered into in a custodial capacity or for obligations arising from control of the custodial property. The Court begins by examining the agreement entered into by the parties.

---

[6]A custodian is a type of fiduciary. *See Buder v. Sartore*, 774 P.2d 1383, 1388 n.7 (Colo. 1989) (stating that "the law is well-established that a custodian is a fiduciary"). This view is consistent with the definition of fiduciary relationships under Wisconsin law. "A fiduciary relationship arises from a formal commitment to act for the benefit of another." *Noonan v. Northwestern Mut. Life Ins. Co.*, 687 N.W.2d 254, 260 (Wis. Ct. App. 2004) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 377 N.W.2d 605, 609 (Wis. 1985)). The existence of the fiduciary relationship is characterized by an inequality or dependence based on superior knowledge or other conditions that give one person an advantage over the other. *See Prod. Credit Ass'n v. Croft*, 423 N.W.2d 544, 547 (Wis. Ct. App. 1988)).

Under Wisconsin law, a court's analysis of a contract begins with the objective meaning of the contract. *State ex rel. Siciliano v. Johnson*, 124 N.W.2d 624. 626-27 (Wis. 1963). Wisconsin law "presumes that the parties understood the import of their contract and that [the parties] had the intention which its terms manifest." *Seitzinger v. Comty. Health Network*, 676 N.W.2d 426, 440 (Wis. 2004) (Abrahamson, J., dissenting) (citing Richard A. Lord, *Wiliston on Contracts* § 31:4 at 271-72 (4th ed. 1999)). In other words, the Court takes contracts at face value. Furthermore, under the canons of contract interpretation, "[a]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts, § 203(a)(1981); *see also Variance, Inc. v. Losinske*, 237 N.W.2d 22, 24 (Wis. 1976) ("This court must assume that the parties attempted to enter into a legal and enforceable contract, and an interpretation favoring legality and enforceability should be adopted.").

The jury found that the signature on the Agreement is Deputy's (and not a forgery). That Agreement, in a box entitled "Account Title/Name" contains the printed words "Doris Deputy C/F." (Supp. Br. Ex. B.) The letters "C/F" indicate that Deputy was signing as the "custodian for" her grandson. Directly below this box, is another box entitled "Account Title/Name" with information entered stating "Casey James Zwart UTMA/WI." (*Id*.) The letters "UTMA/WI" indicate that Deputy was invoking the Wisconsin UTMA when signing

8

the Agreement. Deputy's signature appears in a box designated for "Account Owner's Signature." Directly above this signature box, the following acknowledgment appears:

> I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of this agreement. If this is a joint account, we further acknowledge that we have read, understand and agree to the terms of this agreement contained in paragraph 21 . . . I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22; I (We) have read it and agree to its terms.

*Id.* Casey's social security number appears in the lower left-hand portion of page one of the Agreement in a box designated "Taxpayer Identification Number."

The Agreement identifies who is bound by its terms: "Throughout this agreement, 'I,' 'me,' 'my,' 'we,' and 'us' refer to the client and all others who are legally obligated on my accounts." (Supp. Br. Ex. B. at 2.) (The wording of the Agreement breaks the elementary school rule that prohibits students from using a term when attempting to define that same term.) The sentence ("Throughout this agreement . . .") is complicated by the final modifying prepositional clause "on my accounts." Prior to that prepositional phrase, the sentence identifies any use of first person pronouns or first person possessive modifiers as indicating the "client and all others who are legally obligated on my accounts." The phrase "on my accounts" refers to the client's accounts. But, that phrase also refers to the accounts of those who are legally obligated on the client's account.

The phrase "my accounts" ostensibly extends the binding power of the Agreement not only to the client, but to those who are legally obligated on the client's accounts. If the personal and possessive pronouns implicate those individuals who are legally obligated on

9

the client's account, then "my accounts" literally also includes any accounts held by those legally-obligated individuals. (A very different meaning would be conveyed by altering the ending prepositional phrase to say "on this account" or "on the client's account." That would more clearly limit the obligations to the present account.) In other words, the sentence states that the use of "my" or "I" throughout the agreement is synonymous not only with the client (Deputy's grandson), but also Deputy (as a person legally obligated on the present account), and, therefore, "my accounts" refers not only to the client's accounts, but also to those accounts held by Deputy.

The first page of the Agreement makes very clear that Deputy's legal obligation under this account is circumscribed by her signatory capacity as custodian.[7] That is, after all, the purpose and import of signing in a custodial capacity–to more clearly identify one's legal obligations and liabilities. The Court, therefore, finds that the Agreement unambiguously defines "I", "me," "my," "we" and "us" to refer to Deputy's grandson and Deputy in her custodial capacity. Correspondingly, the phrase "on my accounts" refers to those accounts of Deputy's grandson and any held by Deputy in her custodial capacity.

The arbitration provision of the Agreement reads, in part, as follows:

> Any controversy: (1) arising out of or relating to any of my accounts with you, maintained individually or jointly with any other party, in any capacity; or (2) with respect to transactions of any kind executed by, through or with you, your officers, directors, agents and/or employees; or (3) relating to my transactions

---

[7]The Court does not think it significant that, in the box entitled "Account Owner's Signature," Deputy's signature appears without any qualifying designation identifying her custodial capacity. That relationship is clearly identified at the outset of the agreement and Deputy did not need to include it in her signature.

10

or accounts with any of your predecessor firms by merger, acquisition, or other business combination from the inception of such accounts; or (4) with respect to this agreement or any other agreements entered into with you relating to my accounts, or the breach thereof, shall be resolved by arbitration . . .

Now, this provision creates little difficulty when the party making these statements is, in fact, the client who has signed the agreement and who owns the account. The meaning of the clause, however, is different when the individual making the averments is a representative or agent or custodian of the owner of the account.

Subsection (1) of the arbitration provision poses especial difficulty for Deputy's position that her personal accounts are not implicated by the present Agreement. The Court previously said that the term "my" referred not only to Casey, but also to Deputy as one legally obligated on Casey's account. Even if the Court assumes, for sake of argument, that "my" should be narrowly understood as Deputy *in her custodial capacity* or Deputy *as custodian for Casey*, subsection (1) is problematic. Subsection (1) requires arbitration for any controversy "arising out of or relating to any of my accounts with you, maintained individually or jointly with any other party, *in any capacity*" (emphasis added). This sentence extends arbitration as the sole remedy unequivocally to accounts held in any capacity by the client or those legally obligated on his account. The capacity in which Deputy is obliged on the account becomes irrelevant because the arbitration provision encompasses all capacities.

However, there is an alternative understanding of subsection (1). The parties do not dispute that Deputy signed her grandson's agreement as a custodian. Thus, subsection (1)

11

may be read to include "Deputy as custodian" into any use of the words "I" or "my." Working from this premise, the arbitration provision would require arbitration for any controversy arising out of or relating to any of Deputy's accounts *as a custodian* with Lehman, "maintained individually or jointly with any other party, in any capacity." The phrase "in any capacity" modifies the individual who holds, maintains or owns the accounts–in this proposed interpretation, "in any capacity" modifies "Deputy as custodian." What does it mean, however, to say that Deputy must arbitrate those accounts on which she is obligated as a custodian *in any capacity*? One possibility is that the phrase "in any capacity" becomes surplusage because, in this instance, the "I" of the agreement is already defined as Deputy in a particular capacity, i.e., as a custodian. Such an interpretation makes the phrase "in any capacity" a redundancy.

Put another way, "in any capacity" could expand the obligation to arbitrate, but not beyond the legal entity or individual identified as the "I" in the Agreement. Thus, Deputy's legal status as a custodian would not create obligations for her in other legal capacities. So, while she would be bound on any accounts which she signed in a custodial capacity–whether as the primary custodian, a joint custodian, or some other possibility–the arbitration provision could not extend to other legal identities. Or, more narrowly, "in any capacity" might bind Deputy on accounts where she signed as the custodian *for her grandson*. This latter possibility depends on how broadly or narrowly the "I" of the Agreement is defined, whether it is Deputy, Deputy as custodian, or Deputy as custodian for her grandson. However, this

12

interpretation is problematic insofar as it renders the phrase "in any capacity" superfluous because Deputy's signatory capacity *was* as custodian. (It would make little sense for the Agreement to bind to arbitration any accounts held by an individual in a capacity in any capacity.)

The Court will not read the Agreement so that certain terms become mere surplusage. Just as courts cannot rewrite contracts or insert terms that the parties did not intend, so too, it will not remove terms that have been agreed to. *See Columbia Propane, L.P. v. Wis. Gas Co.*, 661 N.W.2d 776, 783 (Wis. 2003); *Isermann v. MBL Life Assurance Corp.*, 605 N.W.2d 210, 217 (Wis. Ct. App. 1999) ("Courts must read contracts to give a reasonable meaning to each provision and avoid a construction that renders portions of a contract meaningless."). The Agreement will be construed as written. *See Amcast Indus. Corp. v. Affiliated FM Ins. Co.*, 584 N.W.2d 218, 226 (Wis. Ct. App. 1998) (citing the well-known rule of contract construction that contracts must be construed as written). The Court, therefore, does not accept an interpretation of the arbitration clause that renders the phrase "in any capacity" nugatory. The agreement language obviously binds Casey on any accounts that he may hold with Lehman. Deputy, as his custodian, is legally obligated on his account, and has agreed to be bound by the Agreement's terms. These terms clearly implicate the present account and bind both Deputy and her grandson not just on the instant account, but on any accounts that they may hold with Lehman, in any capacity.

13

Deputy, however, argues that this conclusion is not tenable and controverts the plain language and legislative intent of Wisconsin's UTMA. Deputy correctly states that section 880.69 of the Wisconsin Statutes "expressly relieves a custodian from personal responsibility for obligations incurred as custodian, on behalf of the trust." (Supp. Br. at 8.) She also states that, pursuant to the Wisconsin UTMA, she "cannot be held personally liable for a contract she signs in her custodial capacity." (*Id*. at 9.) Finally, she claims that she cannot be "personally bound to obligations, including contractual obligations, arising from control of the trust property." *Id*.

Deputy cites *Califano v. Shearson Lehman Bros., Inc.* 690 F. Supp. 1354, 1355 (S.D.N.Y. 1988) and *Velis v. Blair*, 1989 WL 135379 (S.D.N.Y. Oct. 30, 1989) to support her position. A careful reading of these cases shows that they are of no help to Deputy. In *Califano*, an individual opened both personal and corporate accounts with the defendants. The defendants argued that the arbitration provision contained in the plaintiff's personal account agreement mandated arbitration for disputes concerning his corporate account. The court, however, found no reason to disregard the corporate entity–even though the plaintiff was the sole shareholder of the corporation–and concluded that the arbitration clause contained in the plaintiff's personal customer agreement did not apply to the corporate account he established. *Id*. Similarly, in *Velis v. Blair*, the court denied the defendants' motion to compel arbitration and found that an arbitration provision in an individual joint account did not extend to a trust account, which the plaintiffs signed in their capacity as

14

trustees. 1989 WL 135379, at * 3 (S.D.N.Y. Oct. 30, 1989). The *Velis* court reasoned that, insofar as the plaintiffs opened a pension plan account as trustees (rather than in their individual capacities), the plan account agreement's language to arbitrate "transactions with or for me" implicated only trades made on behalf of the pension plan. *Id*.

A consideration of the language of the agreements, in both cases, is critical to understanding the courts' analyses. The *Califano* court pointed out that courts do not lightly pierce the corporate veil; in *Velis*, the court talked about the difference between an individual signing in an individual capacity versus as a trustee. Both cases carefully analyze the capacity in which an individual enters into an agreement. Both cases have their holdings rooted *in the language of the contracts at issue*. This is an important point. Neither court found reason to apply arbitration provisions beyond the scope suggested by their plain language. Neither court suggested that it was legally impossible for an individual to be bound in multiple capacities through an arbitration provision contained in a single agreement if the language of the arbitration provision proved sufficiently broad.

Deputy also cites to *Mionis v. Bank Julius Baer & Co., Ltd.*, 301 A.D.2d 104 (N.Y. App. Div. 2002). In *Mionis*, a New York appellate court found that an arbitration provision in an agreement executed by a party as agent for certain fund accounts did not encompass claims suffered by that party in its general corporate capacity. *Mionis*, 301 A.D.2d at 110. Deputy, drawing on the reasoning of the *Velis* court, points to the "well-settled principle"

15

that "an agent who signs a contract on behalf of a known principal cannot be held to have made a commitment in his or her individual capacity." *Id*.

*Mionis* is readily distinguishable from the present circumstances. Much like *Califano* and *Velis*, the *Mionis* court looked to the wording and definitions contained in the agreement between the parties. Its decision was limited by the words of the agreement and principles of agency law. While Deputy hones in on the rule that the agent of a disclosed principle cannot be found to have committed himself in his individual capacity, there is another principle under New York law that Deputy fails to cite: "An agent acting for a disclosed principal may . . . bind himself personally by a contract made in behalf of the principal if he so volunteers or if the other party requires it." *Shoenthal v. Bernstein*, 276 A.D. 200, 204 (N.Y. App. Div. 1949). Wisconsin has the same rule. *See Theuerkauf v. Sutton*, 306 N.W.2d 651, 659 (Wis. 1981) (stating the general agency rule followed by courts that an "agent is only liable where there is clear and explicit evidence of an intention to substitute or superadd his liability."); *Wisconsin Title Serv., Inc. v. Kirkland & Ellis*, 483 N.W.2d 275, 277 (Wis. Ct. App. 1992) (recognizing the principle that an agent may expressly or impliedly incur or intend to incur personal responsibility).

At first blush, it appears as though Deputy's explicit invocation of Wisconsin's UTMA conflicts with the reach of the Agreement's arbitration provision into her personal, private accounts. Deputy signed the Agreement pursuant to the Wisconsin UTMA, which protects Deputy personally from liability, but the Agreement makes Deputy personally liable

16

via an arbitration provision. The Court now considers the proper resolution of this conflict.

Under the canons of contract interpretation, "[a]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts, § 203(a)(1981). Wisconsin courts attempt to harmonize contradictory statements within a contract, but, if that effort proves unavailing, courts must decide which provision should be given effect. *See Isermann*, 605 N.W.2d at 217. The present situation, however, is not simply a matter of reconciling a contract's internally conflicting provisions. Arguably, the arbitration provision of the Agreement conflicts with state law, specifically the Wisconsin UTMA. The Court must determine if there is a conflict between Wisconsin law and the Agreement. This analysis begins with an examination of the Wisconsin UTMA.

Wisconsin has adopted the Uniform Transfers to Minors Act and codified it at sections 880.61 to 880.72 of the Wisconsin Statutes. Section 880.61(6) defines "custodian" as a "person so designated under s. 880.65 or a successor or substitute custodian designated under s. 880.695. Wis. Stat. § 880.61(6). Section 880.67 defines the powers of a custodian and states that "[a] custodian, acting in a custodial capacity, has all the rights, powers and authority over custodial property that unmarried adult owners have over their own property, but a custodian may exercise those rights, powers and authority in that capacity only." Wis. Stat. § 880.67. Furthermore, in section 880.665, it states the various functions that a custodian "shall" perform, including taking control of custodial property and managing the

17

same.  Wis. Stat. §§ 880.665(a) & (c).  Subsection (4) of section 880.665 states that "[a] custodian at all times shall keep custodial property separate and distinct from all other property in a manner sufficient to identify it clearly as a custodial property of the minor." Wis. Stat. § 880.665(4).

Important to the present analysis, section 880.69 of the Wisconsin UTMA states that:

(1) A claim based on a contract entered into by a custodian acting in a custodial capacity, an obligation arising from the ownership or control of custodial property or a tort committed during the custodianship may be asserted against the custodial property by proceeding against the custodian in the custodial capacity, whether or not the custodian or the minor is personally liable therefor.

(2) A custodian is not personally liable:

(a) On a contract properly entered into in the custodial capacity unless the custodian fails to reveal that capacity and to identify the custodianship in the contract; or
(b) For an obligation arising from control of custodial property or for a tort committed during the custodianship unless the custodian is personally at fault.

Wis. Stat. § 880.69.  Arguably, Deputy's claim falls squarely within the ambit of § 880.69(2)(a) or (b).  The Court must further analyze the statute to determine if Deputy's invocation of its protections conflicts with Lehman's arbitration provision.

Under Wisconsin law, the purpose of statutory interpretation "is to determine what a statute means so that it may be given its full, proper, and intended effect." *State v. Reed*, 695 N.W.2d 315, 319 (Wis. 2005).  The starting point for such analysis is the language of a statute because courts assume that legislative intent is expressed in the words of the

18

legislation. *Id.* Courts should understand statutory language in its common, ordinary meaning. *Id.* If the meaning is plain, the Court is bound to that meaning and its inquiry need not proceed further. *Id.*

Under Wisconsin law, even where a statute is unambiguous by its own terms, the statute may be considered ambiguous when applied to a certain set of facts. *See Reyes v, Greatway Ins. Co.*, 597 N.W.2d 687, 691 (Wis. 1999) ("Depending on the facts of a case, the same statute may be found ambiguous in one setting and unambiguous in another."); *Hoffman v. Wisconsin Employment Relations Comm.*, 625 N.W.2d 906, 911 (Wis. Ct. App. 2001) (finding statute ambiguous when applied to facts of case); *In re Commitment of Brissette*, 601 N.W.2d 678, 681 (Wis. Ct. App. 1999) ("a statute though unambiguous on its face, may be ambiguous when applied to a particular set of facts"); *State v. Richard G.B.*, 656 N.W.2d 469, 472 (Wis. Ct. App. 2002) ("A statute is ambiguous if it has more than one reasonable interpretation when applied to the facts of a particular case.").

The Wisconsin UTMA is silent about whether a custodian may waive her statutory protections or "contract away" her custodial status. *See In re Prestin*, 650 N.W.2d 920, 923 (Wis. Ct. App. 2002) (finding statute ambiguous because it did not explicitly state whether more than one party in a parental rights termination case could request a substitution of judges). In at least one case, the state legislature explicitly proscribed individual waiver of a statutorily provided protection. *See Kiss v. Gen. Motors Corp.*, 630 N.W.2d 742, 751 (Wis. Ct. App. 2001) (noting that the legislature explicitly provided that the protections of

19

Wisconsin's "Lemon Law" could not be waived by a consumer). While Deputy has properly entered into the Agreement and revealed her capacity in accord with the statute's requirements, the Agreement's arbitration provision purports to bind Deputy in her individual capacity. The Wisconsin UTMA does not address what happens when a person signs as a custodian, but the contract expressly binds–at least in some ways–the signor as an individual. In short, Wisconsin's UTMA is ambiguous as applied to these facts: it does not say whether a person can be protected by her custodial capacity when she signs an agreement clearly binding her as an individual.[8]

When the language of a statute is ambiguous or when a statute is ambiguous when applied to a given set of facts, the court should examine the scope, history, context, subject matter and object of the legislation. *See State v. Isaac*, 582 N.W.2d 476, 478 (Wis. Ct. App. 1998).[9] The Wisconsin UTMA is based on, and mirrors, the Uniform Transfers to Minors Act (UTMA). Uniform Transfers to Minors Act, 8C U.L.A. 13 (2001). That Uniform Act

---

[8]Ambiguity may also arise from the term "liable" as it appears in section 880.69(2) of the Wisconsin Statutes. The Wisconsin UTMA does not define that term and it could be interpreted by reasonable minds in more than one manner. *See In re Commitment of Brissette*, 601 N.W.2d 678, 681 (Wis. Ct. App. 1999) (finding statute ambiguous because phrase "in custody" was reasonably open to more than one interpretation).

Black's Law Dictionary defines "liable" as "responsible or answerable in law; legally obligated." Black's Law Dictionary 927 (7th ed. 1999). As a secondary definition, it lists "(Of a person) subject to or likely to incur (a fine, penalty, etc.)." *Id*. The former definition, if applied to the instant facts, suggests that the arbitration provision of the Agreement, if applied to Deputy's personal accounts, offends the Wisconsin UTMA. The latter definition, however, if accepted when reading the relevant statutory provisions, suggests that the UTMA is not implicated even if Deputy's personal accounts are bound by the arbitration provision. After all, Lehman is not attempting to hold Deputy financially responsible for activity related to her grandson's account.

[9]The Court distinguishes the ambiguity of a statute as applied to the facts of a given case from contractual ambiguity. The latter is not operative here. The Agreement is not ambiguous by its terms and, therefore, contrary to Deputy's urging, the Court need not consider the rule that ambiguities in contracts should be interpreted against the drafter. *See Moran v. Shern*, 208 N.W.2d 348, 352 (Wis. 1973). The ambiguity in the present controversy arises from the interplay between the Wisconsin UTMA and the terms of the Agreement.

was adopted by the National Conference of Commissioners on Uniform State Laws in 1983. The UTMA improved upon, and in many states, replaced, the Uniform Gifts to Minors Act (UGMA) adopted by the same conference in 1956 and twice revised in the mid-1960's. The UGMA was adopted by Wisconsin in 1957, underwent subsequent revision, and was eventually superseded by the Wisconsin UTMA.

The UGMA grew out of the "Model Act Concerning Gifts of Securities to Minors" (the "Model Act"). That act was intended to provide "a simple, inexpensive method for making gifts of securities to minors, for accomplishing what could previously be done under a trust instrument." Uniform Gifts to Minors Act, 9B U.L.A. 222 (1966). The UGMA broadened the objectives of the Model Act, but also permitted gifts of money for investment, permitted donors to "select as original custodians any adult person in whom he has confidence," and permitted banks and companies to act as original and successor custodians. *Id*. at 252. Though revisions were subsequently made to the original Act, the UGMA's essential goal of facilitating gifts to minors remained unchanged. *Id*. at 226.

The Wisconsin bill and related drafting records that eventually resulted in the adoption of the Wisconsin UGMA do not identify any alternative goal or policy other than those discussed above. Later, the UTMA expanded the types of property that could be transferred to a custodian for the benefit of a minor. *See* 1987 Bill Drafting Records, Document entitled "Why the Uniform Transfers to Minors Act?" One of the comments in the 1987 Wisconsin UTMA bill drafting records states that

21

> UTMA recognizes that increasing the kinds of property which can be transferred to a minor poses potentially greater liability problems for both minors and their custodians. To offset that possibility, UTMA insulates both custodian and minor from personal liability ***when a third party brings a claim against the custodial property***–provided neither was personally at fault, and the custodian is not found to have concealed his or her custodial role.

*Id*. at 1-2 (emphasis added). Also, the Wisconsin drafting notes contain a section-by-section analysis of the UTMA. The notes for Section 17–which became codified as section 880.69 of the Wisconsin Statutes–state that the purpose of that section was "to limit the liability recourse of third parties solely to the custodial property." 1987 Wisconsin UTMA Bill Drafting Records, Document entitled "Uniform Transfers to Minors Act; Section by Section Analysis of the Act" at 2.[10]

In sum, the primary goal and purpose of the UTMA, and its predecessor, the UGMA, was to establish a simple way of giving money or property to minors while allowing a custodian to oversee the gift without the complication of establishing a formal trust or guardianship. Case law in the various states that have adopted the UTMA reflect these objectives. *See Buder v. Sartore,* 774 P.2d 1383, 1387 (Colo. 1989) ("The overriding goal of the UGMA/UTMA is to preserve the property of the minor."); *In re Marriage of Hendricks*, 681 N.E.2d 777, 781 (Ind. Ct. App. 1997); *In re Marriage of Rosenfeld*, 668

---

[10]Previously (see footnote 8), the Court noted that the term "liable" as used in the Wisconsin UTMA may itself be ambiguous. The drafting history of this legislation and those laws and acts from which it derived suggest that concerns arose over custodial liability as a larger class of property was opened to transferral as gifts. In other words, the concept of custodial liability was directly connected to the type of property being transferred and activities involving maintaining and enhancing those sundry forms of property. It is reasonable to understand that the National Conference of Commissioners on Uniform State Laws as well as the adopting Wisconsin legislature understood "personal liability," in the context of custodial property, as referring to a custodian's own *financial* responsibility for actions or improprieties involving the custodian's maintenance and handling of the custodial property.

N.W.2d 840, 844 (Iowa 2003); *In re Marriage of Kenney*, 137 S.W.3d 487, 491 n.5 (Mo. Ct. App. 2004); *Sutliff v. Sutliff*, 528 A.2d 1318, 1323 (Pa. 1987) (identifying the purpose of the UGMA as providing an inexpensive and easy way for gifting property to minors). The drafting records for the Wisconsin UTMA strongly suggest that subsequent attempts to limit custodial liability were focused solely on third-party claims against custodial property.

Applying these findings to the instant circumstances, the Court does not find that the Wisconsin UTMA precludes the binding power of the Agreement's arbitration provision. Lehman has brought no claims against the custodial property that Deputy has established for her grandson. If Lehman had done so *and* pursued Deputy's own personal assets and property because of her relationship to Casey's account (i.e., as custodian), then the UTMA's protections would be operative. The Court's decision does not undermine the UTMA or render it feckless. *See State v. Davis*, 637 N.W.2d 62, 66 (Wis. 2001) ("A cardinal rule in interpreting statutes is to favor an interpretation that will fulfill the purpose of the statute over an interpretation that defeats the manifest objective of the act.").

Even if this Court found that the Wisconsin UTMA was not ambiguous and squarely applied to the facts of this case and explicitly precluded assignment of personal liability, Deputy would still be bound by the Agreement's arbitration provision. Wisconsin case law contains examples where parties have been allowed to waive statutory protections. *See Jones v. Jones*, 646 N.W.2d 280, 285 (Wis. 2002) (holding that spouses can waive homestead protection afforded by Wisconsin statute); *In re Estate of Reist*, 281 N.W.2d 86 (1979)

23

(discussing waiver of dead man's statute). In order to waive a statutory right or benefit that protects an individual, a waiver must be clear and unambiguous. *See Faust v. Ladysmith-Hawkins Sch. Sys.*, 277 N.W.2d 303, 306 (Wis. 1979). Such a waiver also must be voluntary and intentional. *Id.* However, waiver of statutory protections is not simply a matter resigned to the discretion of, and personal agreement between, parties. "Where a statutorily created private right serves a public policy purpose, the persons or entities protected by the statute cannot waive the right." *Id.* (citing *Von Hul v. Trempealeau County Mut. Ins. Co.*, 146 N.W.2d 516 (1966); *Jones v. Preferred Accident Ins. Co.*, 275 N.W. 897 (1938)).

The Court has already found that the language of the Agreement–from the definition of "I" and "my" to the construction of the arbitration clause–clearly mandates arbitration for controversies related to those accounts held by Deputy in an individual capacity. Therefore, Deputy's waiver was clear and unambiguous. She would have a difficult time claiming that the waiver of her rights under Wisconsin law (as well as her agreement to be bound by the arbitration provision of her grandson's agreement) was anything other than knowing and voluntary given the explicit terms of the Agreement. The more salient question is whether Wisconsin law related to transfers to minors serves a public policy purpose. Put another way, the Court must determine whether it would be contrary to public policy to permit a waiver of the provisions of section 880.69 of the Wisconsin Statutes.

Wisconsin courts define public policy as "that principle of law under which freedom of contract or private dealings is restricted by law for the good of the community." *Atkins*

24

*v. Swimwest Family Fitness Center*, 691 N.W.2d 334, 338-39 (Wis. 2005) (defining "public policy" when considering enforceability of contractual exculpatory clauses) (citations omitted). Public policy is a "broad concept embodying the community common sense and common conscience." *Eckes v. Keith*, 420 N.W.2d 417, 419 (Wis. Ct. App. 1988) (citations omitted). Public policies may be found in the constitution of the state as well as its legislation. *Id.*

The Court does not find that allowing Deputy to waive the protections afforded by the Wisconsin UTMA contravenes public policy. The Court has already elucidated the purpose of the statute as well as the meaning behind that section identifying and limiting custodial liability. Allowing Deputy to waive the statute's protections does not hinder the ability of custodians to gift property to minors. Nor does it affect their ability to manage that property until the minors come of age.

The purpose of the UTMA, as discussed above, is fairly narrow–to facilitate the giving of gifts to minors. Though the legislative records that the Court has reviewed are limited in their contents, the Court has identified at least two pieces of drafting records suggesting that the evolution of the UTMA coincided with a desire to protect a custodian's personal assets and property from third parties seeking to impose liability on the custodial estate. The Wisconsin UTMA's protections against impositions of liability on custodians implicate a narrow sense of liability, i.e., exposing one's personal assets or property to satisfy third-party actions. This understanding is supported by the drafting histories examined by

25

the Court and the declared purpose for which the UTMA and its Wisconsin state counterpart were enacted.

Deputy obviously thinks that this conclusion will put the Court on a crash course with sound public policy. (D. Deputy's Reply Br. in Supp. of Rule 50(b) Mot. for J. as a Matter of Law After Trial at 7.) Deputy states that this Court will be standing Wisconsin law and the law of trusts on their heads if it finds that a trustee's personal affairs can be affected by the terms of contracts signed on behalf of the beneficiary of a trust. (*Id.*) The Court concludes otherwise. In fact, Deputy asks this Court to rule that a person is not bound by the terms of an agreement that he/she enters into. Barring certain exceptions–such as holding an agreement unenforceable as against public policy–such a position would stand the law of contract on its head. The Court's decision leaves both the law of trusts and contracts wholly intact. The Court today holds that Deputy, though signing an Agreement in her custodial capacity and pursuant to the Wisconsin UTMA, clearly waived the protections of that statute by agreeing to be bound by an arbitration provision that encompasses disputes related to accounts held by her in an individual capacity.

Lehman filed its motion for a new trial as a contingency. In its motion, Lehman states that "to the extent that the Court determines that the April 26, 2001, Client Agreement does not mandate arbitration of all of Ms. Deputy's claims, Lehman is entitled to a new trial." (Def. Lehman Bros. Inc.'s Mem. in Supp. of Mot. for a New Trial at 2.) Insofar as the Court

has determined that Deputy must arbitrate her claims against Lehman, the Court will not address Lehman's Rule 59 Motion.

A court may dismiss a case if all of the issues raised before it are arbitrable. *See Third Wave Techs., Inc. v. Mack*, No. 04-C-0079-C, 2004 WL 941205, at *5 (W.D. Wis. Apr. 28, 2004); *Tupper v. Bally Total Fitness Holding Corp.*, 186 F. Supp. 2d 981, 992 (E.D. Wis. 2002). By order dated August 16, 2004, the Court granted motions to stay and for arbitration brought by Lehman's co-defendants. Given its conclusion that Deputy's claims against Lehman must be submitted to arbitration, the Court sees little reason to continue the previously imposed stays. All of Deputy's claims against the Defendants have been referred to arbitration. The proper disposition of the present action is dismissal.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**

Deputy's Rule 50(b) Motion for Judgment as a Matter of Law (Docket No. 158) is **DENIED**.

Lehman's Motion for a New Trial (Docket No. 155) is **DISMISSED** as moot.

Deputy is ordered to proceed to arbitration on her claims against Lehman Brothers, Inc., in accordance with the terms of the Agreement entered into by those parties.

The present action is **DISMISSED** with prejudice. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 16th day of June, 2005.

**BY THE COURT**

*s/ Rudolph T. Randa*

**Hon. Rudolph T. Randa**
**Chief Judge**

28